O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DINA KNORR,<br><br>    Plaintiff,<br><br>v.<br><br>NANCY BERRYHILL, Acting<br>Commissioner of Social Security,[1]<br><br>    Defendant. | Case No. EDCV-16-00648-KES<br><br><br>AMENDED MEMORANDUM<br>OPINION AND ORDER |

Plaintiff Dina Knorr appeals the final decision of the Commissioner denying her application for Social Security benefits. For the reasons stated below, the Commissioner's decision is reversed and remanded for the Commissioner to calculate and award benefits to Plaintiff.

On March 10, 2017, the Court entered an initial Memorandum Opinion and Order reversing and remanding the decision of the Commissioner for an award of benefits. (Dkt. 19.) The Commissioner timely filed a Motion to Alter Judgment under Federal Rule of Civil Procedure 59(e), alleging legal error in the Court's

---

[1] See Fed. R. Civ. P. 25(d) ("[W]hen a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending[,] … [t]he officer's successor is automatically substituted as a party.").

1

decision to remand for an award of benefits, rather than remand for further administrative proceedings. (Dkt. 21.) Plaintiff opposed the motion. (Dkt. 24.) This Amended Memorandum Opinion and Order addresses the arguments raised in the Commissioner's motion, and finds that remand for an award of benefits is nevertheless appropriate.

# I.

# BACKGROUND

On September 18, 2012, Plaintiff filed applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging a disability onset date of October 30, 2009. <u>See</u> Administrative Record ("AR") 52, 142-44. At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on June 23, 2014. AR 34-51. The ALJ issued a decision denying benefits on August 11, 2014. AR 18-29, 34-51.

The ALJ determined that Plaintiff had severe impairments of a back injury and sacroiliac arthrosis. AR 22. The ALJ found that Plaintiff's gastroesophageal reflux disease (GERD), affective disorder, and depression were non-severe. AR 22-24, 26-27. The ALJ concluded that the combination of these impairments did not meet or medically equal the severity of one of the listed impairments set forth in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. AR 24.

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, except that (1) she is limited to sitting for 30 minutes at one time and then would need to be able to stand/stretch for a few seconds, and (2) she is capable of performing occasional postural maneuvers. AR 24. This RFC was consistent with the opinions of two non-examining State agency physicians, which the ALJ gave great weight, but was less restrictive than the opinion of Plaintiff's treating physician, Dr. Gregory D. Carlson, which the ALJ gave little weight. AR 27. The ALJ also relied on the opinion of Dr. Neil J.

Halbridge, who examined Plaintiff and performed a disability analysis under California Worker's Compensation regulations.  AR 26-27.

With this RFC, the ALJ found that Plaintiff was unable to perform her past relevant work as a registered nurse and clinical coordinator.  AR 27.  However, the ALJ found that jobs exist in significant numbers in the national economy that she could perform, such as information clerk, charge account clerk, and bench assembler.  AR 28.  Accordingly, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from October 30, 2009 through the date of the decision.  AR 29.

Plaintiff asked the Appeals Council to review the ALJ's decision, but the Appeals Council declined on February 11, 2016.  AR 1-6, 14-16.  On that date, the ALJ's decision became the final decision of the Commissioner.  <u>See</u> 42 U.S.C. § 405(h).  This timely civil action followed.

## II.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Parra v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla, but less than a preponderance.  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715,

720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006).

## A.    The Evaluation of Disability.

A person is "disabled" for purposes of receiving Social Security benefits if he is unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). A claimant for disability benefits bears the burden of producing evidence to demonstrate that he was disabled within the relevant time period. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## B.    The Five-Step Evaluation Process.

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n. 5 (9th Cir. 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do

4

basic work activities; if not, a finding of not disabled is made and the claim must be denied.  Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC") to perform his past work; if so, the claimant is not disabled and the claim must be denied.  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  Id. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n. 5; Drouin, 966 F.2d at 1257.

### III.

### ISSUES PRESENTED

Plaintiff raises the following two issues:

Issue One:  Whether the ALJ properly evaluated the medical evidence and the opinion of Plaintiff's treating orthopedic surgeon, Dr. Carlson.

Issue Two:  Whether the ALJ properly evaluated Plaintiff's pain testimony. (Dkt. 18 [Joint Stipulation or "JS"] at 4, 31-32.)

**IV.**

**DISCUSSION**

A.  **Issue One: The ALJ's Stated Reasons for Discounting the Opinion of Plaintiff's Treating Physician, Dr. Carlson, Are Not Supported by Substantial Evidence, and the Record as a Whole Does Not Contain Substantial Evidence that Would Support Giving Dr. Carlson's Opinion Little Weight.**

1.  **Applicable Law.**

In deciding how to resolve conflicts between medical opinions, the ALJ must consider that there are three types of physicians who may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did not treat or examine the plaintiff. See 20 C.F.R. § 404.1527(c); Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than that of an examining physician, which is generally entitled to more weight than that of a non-examining physician. Lester, 81 F.3d at 830. Thus, the ALJ must give specific and legitimate reasons for rejecting a treating physician's opinion in favor of a non-treating physician's contradictory opinion or an examining physician's opinion in favor of a non-examining physician's opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); Lester, 81 F.3d at 830-31 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983)).

If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. Lester, 81 F.3d at 830 (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)). However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The factors to be considered by the

adjudicator in determining the weight to give a medical opinion include: "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Orn, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

In determining a claimant's RFC, the ALJ should consider those limitations for which there is support in the record, but the ALJ need not consider properly rejected evidence of subjective complaints. Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) ("The ALJ was not required to incorporate evidence from the opinions of Batson's treating physicians, which were permissibly discounted.").

**2.    Analysis.**

There are three main differences between the RFC assessed by the ALJ and Dr. Carlson's May 2014 opinion. Compare AR 24-27 (ALJ's findings) with AR 935-39 (Dr. Carlson's 2014 opinion). First, the ALJ found Plaintiff was limited to sitting for 30 minutes at one time, and then would need to stand and stretch for a few seconds; Dr. Carlson found that Plaintiff was limited to sitting for 15 minutes at one time, and would need to change positions as needed and take unscheduled breaks. Second, both the ALJ and Dr. Carlson found that Plaintiff was limited to occasional postural maneuvers, but Dr. Carlson also found that Plaintiff could never twist or stoop/bend. Third, Dr. Carlson opined that Plaintiff would likely be absent from work about 2 days per month, whereas the ALJ predicted no atypical absenteeism.

Plaintiff saw Dr. Carlson approximately once a month between August 2010 and May 2014, and he performed two spinal fusion surgeries on her back. See AR 608-711, 835-58, 941-66 (treatment notes); AR 762 (first surgery in August 2010);

AR 732 (second surgery in April 2012). Under Social Security regulations, the length and extent of this treating relationship mean that his opinion is generally entitled to greater weight than the opinion of a non-examining physician. See 20 C.F.R. § 404.1527(c)(2)(i)-(ii); Orn, 495 F.3d at 631. Because Dr. Carlson's 2014 opinion was contradicted by the opinions of two non-examining State agency physicians, who assigned a less restrictive RFC, see AR 53-63, 64-78, the ALJ was required to provide "'specific and legitimate reasons' supported by substantial evidence in the record" for rejecting Dr. Carlson's opinion. Orn, 495 F.3d at 632 (quoting Lester, 81 F.3d at 830).

The ALJ gave the following reasons for assigning Dr. Carlson's opinion little weight: (1) it was inconsistent with Dr. Carlson's treatment notes, which the ALJ characterized as showing "benign physical findings"; (2) it was inconsistent with "objective studies showing no compression and only mild radiculopathy"; and (3) it was inconsistent with Dr. Carlson's own March 2013 evaluation. AR 27. As discussed below, these stated reasons do not provide substantial evidence for favoring the opinion of the non-examining physicians over Plaintiff's long-time treating physician.

### a. Dr. Carlson's Treatment Notes.

After summarizing Dr. Carlson's treatment notes, see AR 608-711, 835-58, 941-66, the ALJ characterized them as inconsistent with Dr. Carlson's May 2014 disability evaluation, see AR 935-39, because the ALJ found the treatment notes "show[ed] benign physical findings." AR 25-27. The ALJ's opinion discusses four specific treatment notes.

First, the ALJ found that in January 2011, Plaintiff "had normal sensation." AR 25 (citing Exhibit 8F/62-71 [AR 669-78]). The cited progress reports state:

> Physical examination shows a mild antalgia to the right. She has *increased tenderness to palpation at the lumbosacral junction and in the center portion of her low back*. There is no erythema, warmth, or

8

signs of infection.  She has a well-healed incision.  *Range of motion is*
*unchanged at 70 degrees of flexion, 5 degrees of extension, and 10*
*degrees of right and left lateral bend*.  There are no motor or sensory
deficits noted.

AR 669, 675 (emphasis added).

Second, the ALJ found that in March 2011, Plaintiff "had a negative straight leg raising test and minimal physical findings."  AR 25 (citing Exhibit 8F/58-61).  The cited progress report states:

Exam today shows that she has an *area of tenderness at L3-4*.  She has
*increasing pain with extension or lateral bend to the left*.  She has no
motor or sensory deficits in the legs.  She has a negative straight leg
raise.

AR 667 (emphasis added).

Third, the ALJ found that in July 2011, Plaintiff "presented with a negative straight leg raising test and good range of motion in her hips."  AR 25 (citing Exhibit 8F/46-48 [AR 653-55]).  The cited progress report states:

Physical examination shows that she [is] *exquisitely tender at the L3-4*
*level*.  She is nontender above this.  She is nontender at the lumbosacral
junction.  She has *increasing pain with forward bend more than 40*
*degrees or extension*.  She has negative straight leg raise and good hip
range of motion.

AR 654.

Lastly, the ALJ found that in March 2013, Plaintiff "reported a worsening of her pain" but "her physical findings were benign."  AR 26 (citing Exhibit 13F/3-12 [AR 837-46]).  The cited progress reports state:

Exam today shows that her posture is straight and upright.  She has
*tenderness across her surgical site and just proximal to this*.  She has
no frank motor deficits in the legs.  She has good hip range of motion.

. . .

Exam today shows she is *tender at the upper part of her posterior lumbar incision.* She also has a *degree of tenderness in the mid thoracic region* at the bra level at approximately T8 to T10. She has no motor deficits in her legs, although she is describing new numbness and tingling in her feet.

AR 837, 845 (emphasis added).

In describing Dr. Carlson's treatment notes as showing benign physical findings on these four dates, the ALJ omitted material portions of the treatment notes, which are italicized above. Specifically, the ALJ omitted Dr. Carlson's reports of limitations in postural movements, as well as observations of "tenderness" that corroborated Plaintiff's subjective complaints of pain.

b.    Objective Studies.

The second reason the ALJ gave for giving Dr. Carlson's opinion little weight was that the opinion was inconsistent with "objective studies showing no compression and only mild radiculopathy." AR 27.

*MRIs of the Lumbar Spine in February and August 2011*

The ALJ found that in February 2011, an "MRI taken of her lumbar spine did not show any evidence of spinal canal or foraminal stenosis."[2] AR 25 (citing Exhibit 8F/103-04 [AR 710-11].) This accurately reflects the finding of the doctor

_____

[2] "The spine is made up of 33 bones. These and the discs between them provide a passage for the spinal cord and nerves. The spinal cord itself connects the nerves of the body to the brain. Spinal stenosis is a narrowing of the passage where the spinal cord runs." Cedars-Sinai, http://www.cedars-sinai.edu/Patients/Health-Conditions/Spinal-Stenosis.aspx . "Additional openings called foramen allow the nerves branching from the spinal cord to travel to the arms, legs and other parts of the body. … [W]ith age and conditions like arthritis, the foramen may become clogged. Bony spurs can develop inside and press on the nerves." Cedars-Sinai, https://www.cedars-sinai.edu/Patients/Health-Conditions/Foraminal-Stenosis.aspx .

10

who initially analyzed the MRI on February 23, 2011.  AR 711.  However, Dr. Carlson disagreed with these findings, and later objective tests indicated that Plaintiff *did* have stenosis.

On March 4, 2011, Dr. Carlson opined that the February 2011 MRI "show[ed] some evidence of some enlargement and hypertrophy of the ligaments and new foraminal and lateral recess narrowing at these levels [L3-4]."  AR 668. He was "concerned that [Plaintiff's] increasing back pain and radicular symptoms [were] related to an adjacent level irritability at the facet joints."[3]  AR 668.  "In order to prove the diagnosis as well as provide a treating effect," he recommended "a lumbar facet injection aimed at L3-4, right and left."  AR 668.  Plaintiff received the recommended lumbar facet injection, AR 665, but reported it "did not give her much relief."  AR 662.

In April 2011, Dr. Carlson requested a new objective study, a lumbar diskogram at the L3-4 level.  AR 663.  However, insurance coverage for this study was denied.  AR 661.  At this time, as noted supra, Dr. Carlson observed that Plaintiff was "exquisitely tender at the L3-4 level," and had "increasing pain with forward bend more than 40 degrees or extension," although she had "a negative straight leg raise and good hip range of motion."  AR 662.

In July 2011, Dr. Carlson requested authorization for "a myelogram with post myelography CAT scan" to "help [him] more fully evaluate the neural foraminal channel and the adjacent segments to determine if in fact there is any impingement or compression at the adjacent segments."  AR 654.  He explained, "Her [February 2011] MRI was of rather poor quality and showed some mild disk dessication." AR 654.  It appears that coverage for this was also denied, as it was not performed.

---

[3] "The vertebral bodies are stacked one on top of another to form the entire structure of the spine.  On each side of the vertebral bodies are tiny joints called facet joints." UCLA Health Neurosurgery, http://neurosurgery.ucla.edu/facet-joint-syndrome .

In August 2011, Dr. Carlson again opined:

> [Plaintiff] has had recurrence of her original radiating left leg pain. I
> am concerned her symptoms are related to a progression of the adjacent
> level degenerative changes. *I am concerned the poor quality of the MRI*
> *scan recently performed in February inhibits us from defining this and*
> *comparing this to the original pre-surgery MRI.* It is notable that in my
> initial evaluation of [Plaintiff] prior to surgery, I did note she had some
> mild degenerative changes at the L3-4 level. However, at this level
> [Plaintiff] did not have evidence of foraminal narrowing, and therefore,
> this level was not included in the fusion. *It is possible [Plaintiff's]*
> *ongoing problem is related to advancement or a more symptomatic*
> *degenerative change at the L3-4 level.* In order to work this up,
> [Plaintiff] needs a very high-quality closed MRI scan to define any type
> of neural degenerative changes.

AR 650 (emphasis added).

A second MRI of the lumbar spine was performed in August 2011. AR 708-
09. The ALJ found that this MRI "showed lumbar fixation at the L4-S1 levels with
epidural fibrosis without significant impression on the thecal sac as well as
degenerative disc disease with mild posterior bulge at the L3-L4 level with facet
and ligamentous hypertrophy creating *mild central canal stenosis with mild*
*encroachment on both lateral foramina*." AR 25 (citing Exhibit 8F/101-02 [AR
708-09]) (emphasis added). This is consistent with Dr. Carlson's analysis.
AR 647.

This second MRI showing degenerative disk disease at the L3-4 level, along
with Plaintiff's continued reports of pain, caused Dr. Carlson to begin considering a
second spinal fusion surgery to advance the fusion to the L3-4 level. AR 647.
"Before making this determination," he recommended "a preoperative lumbar
diskogram at the L3-4 with a control level at L2-3 and post diskography CAT

scanning." AR 647. At this time, on September 28, 2011, Dr. Carlson examined Plaintiff and observed that she could "stand and walk" but had "discomfort as she move[d] from a sitting to a standing position" and was "quite tender to palpation at the L3-4 level." AR 646. She also had "increasing pain with forward bend more than 40 degrees as well as extension past neutral" and "on the left at 90 degrees … [she] develop[ed] increasing discomfort in the left lateral thigh." AR 646.

In February 2012, Dr. Carlson analyzed a new lumbar x-ray and found it confirmed that Plaintiff had "degenerative changes in the intervertebral disk above the previously performed fusion" and "when compared to preoperative x-rays, there is clearly an increase in narrowing at the L3-4 level." AR 634. He referred Plaintiff to another doctor for a second opinion, and that doctor agreed that the tests showed Plaintiff was "developing stenosis at the L3-4" and there were "changes at L3-4 consistent with disc degeneration." AR 603. He concurred with Dr. Carlson's recommendation for a second spinal fusion surgery, if further tests confirmed "that L3-4 is the generator of her pain." AR 603; see also AR 631. In March 2012, a CT scan confirmed that the "L3-4 discs contribute to [Plaintiff's] pain complex." AR 702, 631. Plaintiff ultimately had a second spinal fusion surgery on April 17, 2012. AR 732.

The ALJ's opinion does not discuss Dr. Carlson's disagreement with the February 2011 MRI results, or the later evidence of degenerative disc disease and foraminal narrowing from the objective tests done in February or March 2012.

### March 2013 MRI of Lumbar Spine

The ALJ found, "a[n] MRI taken of [Plaintiff's] lumbar in 2013 after her second surgery showed no significant dural compression or neural foraminal stenosis." AR 26 (citing Exhibit 11F/1-2 [AR 815-16].) The cited MRI is dated March 13, 2013. AR 815. The doctor who performed it opined that it showed "no significant dural compression or neural foraminal stenosis … in the lumbar spine." AR 816.

However, regarding the L1-2 disk, the doctor also noted "mild bilateral facet hypertrophy."[4]  AR 815.  When Dr. Carlson reviewed the scan in April 2013, he agreed that it showed "an open spinal canal from L2 to S1," where Plaintiff had had the fusion surgery, but he also opined: "Of particular note is that there are new degenerative disk desiccation changes."  AR 845.  He diagnosed Plaintiff with "early degenerative disk changes, adjacent level of L1-2," as well as "lumbar radiculitis."  AR 846.

*July 2013 Nerve Conduction Study and MRI of Lumbar Spine*

The ALJ found that in 2013, after Plaintiff's second spinal fusion surgery, "nerve conduction studies showed only mild L5 radiculopathy on the left."  AR 26 (citing Exhibit 20F/20-24 [AR 960-64].)  The cited study is dated July 11, 2013. AR 960.  Dr. Carlson reviewed the study in December 2013 and diagnosed Plaintiff with "chronic L5 radiculopathy, left."  AR 947.

However, in the same progress report, Dr. Carlson also discussed other objective studies as follows:

> I have reviewed the SPECT / CT imaging.  This demonstrates uptake at the anterior interbody spaces from L2 to S1.  This shows no clear evidence of pseudarthrosis in combination with a CT.  In fact, this appears solid.  Of particular note is [Plaintiff] has a *bright area of uptake in the right sacroiliac joint*.  The CT scan views of this area show *evidence of sclerosis in the joints suggestive of arthritic changes*. There is mild scoliosis on AP views with intervertebral setting, more on the left part of the disk at L1-2.

AR 946-47 (emphasis added).  The ALJ's opinion does not discuss this SPECT /

---

[4] "If the facet joint becomes too swollen and enlarged, it may block the openings through which the nerve roots pass, causing a pinched nerve. This condition is called facet hypertrophy."  Cedars-Sinai, https://www.cedars-sinai.edu/Patients/Health-Conditions/Facet-Joint-Syndrome.aspx .

14

CT imaging.

In sum, the objective studies in the record do not provide substantial evidence for giving Dr. Carlson's opinion little weight. Regarding the February 2011 MRI of the lumbar spine, the ALJ failed to take into account the evidence contradicting the conclusion of the doctor who initially analyzed the MRI, that there was no spinal canal or foraminal stenosis. AR 711. This contradictory evidence consisted of: (1) Dr. Carlson's disagreement as to the L3-4 vertebrae and his opinion that the February MRI was of poor quality, see AR 668, 654, 650; (2) the results of the August 2011 MRI showing stenosis and degenerative disc disease at L3-4, as confirmed by the initial reviewing doctor, see AR 708-09, Dr. Carlson, see AR 647, and a consulting doctor who recommended a second spinal fusion surgery, see AR 603; and (3) the tests done in February and March 2012, which confirmed these results, see AR 600, 630-31, 634, 702.

The ALJ's opinion did not explicitly consider Dr. Carlson's disagreement or the results of the February and March 2012 studies. The ALJ did mention the August 2011 MRI but appeared to dismiss it because the initial reviewing doctor described the degenerative disc disease as "mild." AR 25. Yet two treating doctors relied on the results of this test, as well as Plaintiff's reported pain levels and observable limitations in her postural movements, to recommend spinal fusion surgery. The ALJ also omitted relevant findings from the March 2013 MRI of the lumbar spine and the July 2013 studies, and failed to consider the SPECT / CT imaging from the same period, which confirmed problems in Plaintiff's sacroiliac joint.

c.    Dr. Carlson's Opinion from March 2013.

The ALJ found that Dr. Carlson's May 2014 opinion was entitled to little weight because it was inconsistent with Dr. Carlson's own opinion from March 2013, approximately 1 year earlier. AR 26 (citing Exhibit 13F/15-17 [AR 849-51].) Dr. Carlson's progress report dated March 11, 2013 stated as follows:

15

Temporarily totally disabled. In regard to [Plaintiff's] overall impairment, [Plaintiff] has not been able to return to work due to her pain due to the fact that she cannot lift greater than 10 pounds. She is not able to do repetitive bending, stooping, and lifting. She is not able to find a position of comfort, sit, or stand for more than 30 minutes at a time.

AR 850. These functional limitations are less restrictive than those in Dr. Carlson's 2014 opinion, wherein he opined that Plaintiff was limited to sitting for no more than 15 minutes at one time, would need to change positions at will and take unscheduled breaks, and would likely be absent from work about two days per month. AR 935-39.

Plaintiff argues that the 2014 report simply reflects "slightly greater" limitations "because [Plaintiff's] condition has continued to deteriorate and her pain has been confirmed by EMG evidence"; thus, Plaintiff argues, the later opinion is "more informed." (JS at 8.) The Court agrees. Based on Dr. Carlson's treatment notes after March 2013, Plaintiff's continuing reports of pain and objective studies confirming the source of that pain could have reasonably caused Dr. Carlson to assign her a more restrictive RFC in 2014.

The treatment notes are summarized as follows:

In April 2013, Plaintiff reported "increasing back pain and also pain, numbness, and tingling into the legs." AR 845. Physical examination revealed she was "tender at the upper part of her posterior lumbar incision" and had "a degree of tenderness in the mid thoracic region at the bra level…." AR 845. Dr. Carlson recommended a pain management approach. AR 846. He started her on Cymbalta, and she continued on Norco, Soma, and Medrol. AR 843.

In May 2013, Plaintiff continued to describe "increasing symptoms of pain in her back," "feelings of jolting, numbness, and

16

tingling into the feet, particularly now as she [was] walking," and "difficulty sitting for any length of time." AR 837. Similarly, in July 2013, Plaintiff reported "increasing pain more to the left side" and "pain across her lumbrosacral junction." AR 965. Dr. Carlson opined the pain could "be related to the sacroiliac joint arthrosis and adjacent levels above her fusion."[5] AR 965-66. He recommended "a trial of sacroiliac joint injections to identify sources of pain" and "the use of a lumbar support corset." AR 966.

An electro-diagnostic EMG study conducted on July 11, 2013 "reveal[ed] evidence of mild chronic L5 radiculopathy on the left." AR 960, see also AR 958. This study therefore confirmed Plaintiff's complaints of left-sided pain and numbness.

In September and October 2013, on Dr. Carlson's recommendation, Plaintiff had lumbar and bilateral sacroiliac joint injections. AR 956, 951-52. However, she reported they gave her no relief or only short-term relief. AR 953, 949.

In November and December 2013, Dr. Carlson noted that x-rays and a CT scan showed "mild lumbar degenerative disk changes at L1-2," as well as "mild scoliosis on AP view with intervertebral setting, more on the left part of the disk at L1-2." AR 947, 950. He diagnosed sacroiliac joint arthrosis, adjacent level degenerative disk disease at L1-2, and chronic, left-sided L5 radiculopathy. AR 950.

In February and March 2014, at Dr. Carlson's recommendation,

_____

[5] "The sacroiliac joint lies next to the bottom of the spine, below the lumbar spine and above the tailbone (coccyx). It connects the sacrum (the triangular bone at the bottom of the spine) with the pelvis (iliac crest)." Cedars-Sinai, https://www.cedars-sinai.edu/Patients/Health-Conditions/Sacroiliac-Joint-Dysfunction.aspx .

Plaintiff participated in a 4-week "functional restoration program." AR 943, 950. She reported it was "not very beneficial for her overall," although "she did feel that the physical therapy aspect helped with strengthening and range of motion." AR 943.

Plaintiff continued to complain of "low back pain that radiates into her left leg intermittently, associated with numbness and tingling." AR 943. Based on CT scans, Dr. Carlson found "no clear evidence of pseudarthrosis," but a "bright area of uptake in the right sacroiliac joint." AR 944. In May 2014, Plaintiff returned to Dr. Carlson complaining of "a lot of increasing pain in both her low back and her hip." AR 941.

These treatment records show that, despite the second spinal fusion surgery, Plaintiff developed left-sided radiculopathy, as well as problems at the L1-2 level above her fusion and in the sacroiliac joint below her fusion. Plaintiff's subjective reports of pain and numbness in these areas were confirmed by the objective test results, which showed evidence of radiculopathy and degenerative disc disease.

These new developments explain the more limited RFC that Dr. Carlson assigned to Plaintiff in 2014. Compare Harris v. Astrue, 2009 WL 272864, at *4 (C.D. Cal. Feb. 2, 2009) (finding ALJ properly rejected doctor's opinion as inconsistent with his earlier findings because "the record *contains no explanation* for the inconsistency") (emphasis added); Dominguez v. Colvin, 927 F. Supp. 2d 846, 859 (C.D. Cal. 2013) (finding treating doctor's notes *did "not explain* or account for the[] differences" in her two opinions) (emphasis added). Moreover, the differences between Dr. Carlson's 2013 opinion and his 2014 were not major, but rather reflected more pronounced limitations in the same areas. See Cox v. Astrue, 2012 WL 5467803, at *8 (C.D. Cal. Nov. 9, 2012) (finding ALJ improperly rejected doctor's opinion as inconsistent with his earlier opinion because "the inconsistencies were minor, not contradictory" and stood "in sharp contrast to

Rollins [v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001)], in which the physician had claimed that the plaintiff was disabled but his notes from an earlier examination indicated that the plaintiff was not disabled"). Given the intervening treatment notes and objective tests, there was not substantial evidence to support the ALJ's finding that Dr. Carlson's 2014 opinion was unreliable because it was inconsistent with his earlier 2013 opinion.

In sum, the three reasons given by the ALJ for assigning Dr. Carlson's opinion little weight—inconsistencies with Dr. Carlson's treatment notes, the objective studies, and Dr. Carlson's earlier opinion—are not supported by substantial evidence. The Court has also considered whether other evidence in the record provides substantial evidence for giving Dr. Carlson's opinion little weight. As discussed below, the Court finds that there is not.

d. Dr. Halbridge's June 2013 Report.

Dr. Neil J. Halbridge examined Plaintiff in connection with her worker's compensation claim in May 2013, and produced a report detailing his findings in June 2013. AR 869-76. The ALJ found that Dr. Halbridge's functional capacity assessment differed from Dr. Carlson's March 2013 progress reports. AR 26. The ALJ therefore appears to have used this as a further reason for giving Dr. Carlson's ultimate 2014 opinion little weight.

Before analyzing Dr. Halbridge's opinion, the Court notes that "Workers' compensation disability ratings are not controlling in disability cases decided under the Social Security Act, and the terms of art used in the California workers' compensation guidelines are not equivalent to Social Security disability terminology." Booth v. Barnhart, 181 F. Supp. 2d 1099, 1104 (C.D. Cal. 2002); see also 20 C.F.R. § 404.1504 ("[A] determination made by another agency that you are disabled … is not binding on us."). "Proper evaluation of such medical opinions … present[s] an extra challenge. The ALJ must 'translate' terms of art contained in such medical opinions into the corresponding Social Security terminology in order

to accurately assess the implications of those opinions for the Social Security disability determination." Booth, 181 F.Supp.2d at 1106. "While the ALJ's decision need not contain an explicit 'translation,' it should at least indicate that the ALJ recognized the differences between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand, and took those differences into account in evaluating the medical evidence." Id.; see, e.g., Guzman v. Colvin, No. CV 13-05380-MAN, 2014 WL 4961696, at *5 (C.D. Cal. Oct. 3, 2014) ("Because the ALJ did not adequately consider the different meanings of the terms used by Dr. Montgomery in the workers' compensation and Social Security contexts, the ALJ's reference to Dr. Montgomery's workers' compensation findings was not a legitimate reason to discount Dr. Montgomery's assessment of plaintiff's RFC.").

The ALJ accurately found that Dr. Halbridge's May 2013 examination revealed: "a decreased range of motion, a positive straight leg-raising test on the left, hamstring tightness bilaterally, a positive Faber sign on the left and trace positive on the right but also with normal reflexes, motor function, and sensation." AR 26 (citing Exhibit 14F [AR 871]). Dr. Halbridge determined that Plaintiff was "permanent and stationary with restrictions in repetitive bending, stooping, or lifting and no heavy pushing, pulling or lifting over 15 pounds." AR 26 (citing Exhibit 14F [AR 873-75]). The ALJ contrasted these restrictions with Dr. Carlson's assessment from March 2013, which imposed additional limitations of not lifting more than 10 pounds and not being able to sit or stand for more than 30 minutes at one time. AR 26 (citing Exhibit 13F/15-17 [AR 849-51]).

The additional restrictions imposed by Dr. Carlson were based on Plaintiff's subjective reports of pain. Dr. Carlson's March 2013 progress report indicates that the restrictions he imposed were "due to her pain." AR 850. The findings that the ALJ cited from Dr. Halbridge did not account for Plaintiff's subjective reports of pain. See Booth, 181 F. Supp. 2d at 1107 ("For workers' compensation purposes,

… the work capacity index and the subjective factor index are distinct.").  These reports were taken into account in a later October 2013 report, in which he imposed a final disability rating.  See AR 875 (June 2013 report, deferring imposing a final disability rating); AR 863 (October 2013 report).  In October 2013, Dr. Halbridge opined that Plaintiff

> has Class III *moderately severe* pain with pain *present most of the time* and may reach an intensity of 9-10/10 on the pain scale, for which the applicant is prescribed analgesic medications and *associated with alteration in activities of daily living*, including being dependent on others for performance of housework, doing laundry, shopping and needing assistance with dressing….

AR 863 (emphasis added).  Under California Workers' Compensation regulations, "'severe' pain would preclude the activity precipitating the pain" and "'moderate' pain could be tolerated, but would cause marked handicap in the performance of the activity precipitating the pain."  Booth, 181 F. Supp. 2d at 1107 n.8 (citing Cal. Code Regs. Tit. 8, § 9727).

When reading these two reports by Dr. Halbridge in their entirety, they are not inconsistent with Dr. Carlson's functional limitations and therefore do not provide substantial evidence for discounting Dr. Carlson's opinion.  Dr. Halbridge's findings of nearly constant, moderately severe pain that cause alterations in Plaintiff's activities of daily living are consistent with Dr. Carlson's findings.  That these reports of pain were incorporated differently into Dr. Halbridge's analysis simply reflects the difference between a Workers' Compensation analysis of disability and a Social Security analysis of disability, a difference that the ALJ did not acknowledge.  Furthermore, as discussed under Issue Two, the record does not contain substantial evidence supporting the ALJ's finding that Plaintiff's reports of pain were not credible.

1          e.      Opinions of Non-Examining Physicians.

2          On February 13, 2013, a non-examining State agency physician, Dr. S.

3   Amon, opined that Plaintiff was not disabled and had the following RFC: limited to

4   sedentary work; lift and/or carry 10 pounds occasionally; lift and/or carry less than

5   10 pounds frequently; unlimited push and/or pull; stand and/or walk for 2 hours; sit

6   about 6 hours in an 8-hour workday but stand and stretch every 30 minutes for a

7   few seconds; only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and

8   only occasionally stoop, kneel, crouch, or crawl.  AR 60-62.  Dr. Amon did not

9   consider either of Dr. Carlson's evaluations discussed above, as those post-date Dr.

10  Amon's evaluation.  AR 61 ("There is no indication that there is opinion evidence

11  from any source.").

12         On July 15, 2013, another non-examining State agency physician, Dr.

13  Antonio Medina, also opined that Plaintiff was not disabled and had the same RFC.

14  AR 74-75.  Dr. Medina noted the opinions in the record from treating physician Dr.

15  Carlson and workers' compensation examining physician Dr. Halbridge, but did not

16  comment on them.  AR 75-76 ("Source opinion is an issue reserved to the

17  Commissioner.").

18         As discussed above, it was error for the ALJ to rely on these opinions from

19  the non-examining physicians instead of the opinion of Plaintiff's long-time

20  treating physician, because the ALJ's given reasons for favoring their opinions over

21  Dr. Carlson's were not supported by substantial evidence, and the record as a whole

22  did not contain substantial evidence to discount Dr. Carlson's opinion.  "The

23  nonexamining physicians' conclusion, with nothing more, does not constitute

24  substantial evidence, particularly in view of the conflicting observations, opinions,

25  and conclusions of an examining physician."  Pitzer v. Sullivan, 908 F.2d 502, 506

26  (9th Cir. 1990).  "[A] treating physician's opinion must be given controlling weight

27  if it is well-supported and not inconsistent with the other substantial evidence in the

28

record." <u>Lingenfelter</u>, 504 F.3d at 1038 n.10.[6]

**B.** **<u>Issue Two: The ALJ Failed to Give Specific Reasons, Supported by Substantial Evidence, for Discrediting Plaintiff's Pain Testimony.</u>**

**1.** **Applicable Law.**

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, "the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th Cir. 2002). In doing so, the ALJ may consider testimony from physicians "concerning the nature, severity, and effect of the symptoms of which [the claimant] complains." <u>Id.</u> at 959. If the ALJ's credibility finding is supported by substantial evidence in the record, courts may not engage in second-guessing. <u>Id.</u>

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented

---

[6] In her motion to alter judgment, the Commissioner argues that "the Court's summary finding that [the non-examining physicians'] opinions did not constitute evidence is clearly error." (Dkt. 21 at 12.) The Commissioner cites <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002) for the proposition that "opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are *consistent with independent clinical findings* or *other evidence in the record*." (Emphasis added.) Here, the non-examining physicians' opinions are not supported by other evidence in the record, as discussed above.

objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014). The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

The ALJ may also use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for lying and inconsistencies in his statements or between his statements and his conduct. Smolen, 80 F.3d at 1284; Thomas, 278 F.3d at 958-59.[7]

---

[7] The Social Security Administration ("SSA") recently published SSR 16-3p, 2016 SSR LEXIS 4, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims. SSR 16-3p eliminates use of the term "credibility" from SSA policy, as the SSA's regulations do not use this term, and clarifies that subjective symptom evaluation is not an examination of a claimant's character. Murphy v. Comm'r of Soc. Sec., 2016 U.S. Dist. LEXIS 65189, at *25-26 n.6 (E.D. Tenn. May 18, 2016). SSR 16-3p took effect on March 16, 2016, and therefore is

1    **2.    Analysis.**

2        The ALJ did not articulate a clear rationale for finding that Plaintiff's

3    subjective reports of pain were not credible.  The only explicit finding by the ALJ

4    that appears to relate to Plaintiff's credibility concerns Plaintiff's migraines, for

5    which the ALJ found Plaintiff had only received routine or conservative treatment.

6    AR 26.  As a general matter, this can be a reason for finding a plaintiff's reports of

7    pain not fully credible.  <u>See</u> <u>generally</u> <u>Parra v. Astrue</u>, 481 F.3d 742, 750-51 (9th

8    Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a

9    claimant's testimony regarding severity of an impairment."). Yet Plaintiff's

10   treatment for her back pain and radiculopathy cannot be characterized as routine or

11   conservative.  It included two spinal fusion surgeries, regular physical therapy, two

12   types of injections, use of a lumbar support corset, and monthly visits with her

13   orthopedic surgeon.  The finding that Plaintiff sought only routine treatment for her

14   migraines, one alleged side effect of her back injury, does not fully address her

15   complaints of pain and radiculopathy in her back and legs.

16       In the present action, the Commissioner points the Court to other portions of

17   the record that, the Commissioner argues, show the ALJ's credibility finding was

18   supported by substantial evidence.

19           a.    Objective Medical Studies and the Non-Examining Physicians.

20       The Commissioner argues, first, that "the objective medical evidence

21   contradicted Plaintiff's allegations of debilitating pain and symptoms" and that

22   "Plaintiff's subjective complains were inconsistent with the State agency physician

23   opinions."  (JS at 36-37.)  As discussed above under Issue One, however, the

24   objective medical studies confirmed Plaintiff's reports of pain, and the ALJ did not

25   provide articulable reasons, supported by substantial evidence, for giving the non-

26   examining doctors' opinions greater weight than the opinion of Plaintiff's treating

27   _____

28   not applicable to the ALJ's 2014 decision in this case.  <u>Id.</u>

                                            25

1    physician.

2                    b.    Plaintiff's Daily Activities.

3         Second, the Commissioner argues that "Plaintiff's daily activities were

4    inconsistent with her allegations of disability." (JS at 37.) The ALJ did not

5    explicitly find that Plaintiff's reported daily activities were inconsistent with the

6    RFC proposed by Dr. Carlson or with total disability. Regarding her daily

7    activities, the ALJ found that Plaintiff "was able to take her children to and from

8    school, prepare meals, and do light housework but that she needed help with

9    grocery shopping. Further, she testified that she needed to take breaks in between

10   her activity and needed to walk around for about ten minutes after driving her

11   children to school, which took 20 minutes." AR 25. He also found, "She testified

12   that she had good days and bad days with about five bad days a month requiring her

13   to stay in bed all day." AR 25.

14        Regarding taking her children to and from school, Plaintiff testified that this

15   takes about 20 minutes round-trip, and when she gets home she has "to walk around

16   for a little while, at least, you know, ten minutes[.]" AR 43. She also testified that

17   generally, after sitting for 20 minutes, she needs to get up and move around for at

18   least 15 minutes to get comfortable again. AR 45. She further testified that she can

19   stand and walk for 15 or 20 minutes at a time but, "I have to take breaks. I'm not

20   able to do too much at a time." AR 40. She prefers "to be on [her] feet more than

21   sitting," but "[t]hirty minutes is about maximum before [she] can't stand it."

22   AR 45. After that, she testified, "I need to change positions, sit for a few minutes,

23   or lay down. Lay down is the best possible thing for me." AR 46.

24        Regarding housework and grocery shopping, she testified that she generally

25   does not go to the grocery store alone, unless she is buying only one or two items,

26   "because [she] can't carry the bags." AR 43-44. She does not lift more than 10

27   pounds because she has "been told not to," but "[i]t starts to hurt at a gallon of

28   milk." AR 44. Her daughter does the mopping, sweeping, and vacuuming around

26

the house.  AR 43.  She testified that she has good days and bad days; on a good day she can go to the grocery store with her kids, and on a bad day she is "in bed most of the day."  AR 41, 43.

Overall, Plaintiff's testimony is not inconsistent with the portions of Dr. Carlson's proposed RFC that are at issue here, namely: that Plaintiff would need to change positions as needed and take unscheduled breaks, and that she would likely be absent from work about 2 days per month.  AR 935-39.  Her testimony describing her daily activities does not provide substantial evidence for discounting her subjective reports of pain or Dr. Carlson's opinion.

c.  Observations by Dr. Carlson.

Plaintiff argues that the "ALJ made no attempt to consider the testimony of [Plaintiff] in conjunction with Dr. Carlson['s] … record or the medical evidence showing the physical decline of her abilities and functioning from when she stopped working to the present."  (JS at 34.)  The Court agrees.

An ALJ should consider "*observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; functional restrictions caused by the symptoms; and the claimant's daily activities.*"  Smolen, 80 F.3d at 1284 (emphasis added) (citing SSR 88-13).  "[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations."  Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1199-200 (9th Cir. 2008).  "This holding applies with no less force to the opinions of treating physicians."  Page v. Comm'r of Soc. Sec. Admin., 304 F. App'x 520, 521 (9th Cir. 2008).

It is clear from Dr. Carlson's treatment records that he believed Plaintiff's reports of disabling pain.  There are no notes indicating that he suspected Plaintiff

of malingering or exaggerating her symptoms.  In fact, in July 2011, Dr. Carlson noted that Plaintiff was "very motivated" to get back to her prior work as a nurse. AR 653-54.  See Stivers v. Colvin, 2016 WL 889905, at *6 (S.D. Cal. Mar. 9, 2016)  ("Notably in this case, none of the many doctors and specialists treating or examining Plaintiff indicate any suspicion that Plaintiff may be malingering or 'overstating the intensity, persistence or limiting effects' of her problems.").  Moreover, as discussed supra under Issue One, Plaintiff's reports of pain were supported by Dr. Carlson's own observations during physical exams, as well as objective tests like x-rays and CT scans.  Thus, "there is substantial objective and reliable medical evidence in the record to support the severity of plaintiff's disabling pain allegations."  Jahn-Derian v. Metro. Life Ins. Co., No. CV 13-7221 FMO (SHX), 2016 WL 1355625, at *8 (C.D. Cal. Mar. 31, 2016) (rejecting ALJ's attempt to dismiss the medical records and observations of the plaintiff's treating doctor "as mere reiterations of [the plaintiff's] subjective complaints of pain," noting the plaintiff's back surgery, objective test results that explained that explained the cause of the pain, and that the plaintiff's treating doctor "documented his observation of [the plaintiff's] pain symptoms through frequent, ongoing interactions").

**C.     Remand for an Award of Benefits is Appropriate.**

       **1.     Applicable Law.**

Upon review of the Commissioner's decision denying benefits, this Court has "power to enter … a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  If additional proceedings can remedy defects in the original administrative proceeding, a Social Security case usually should be remanded.  Garrison v. Colvin, 795 F.3d 995, 1019 (9th Cir. 2014).  However, courts will sometimes reverse and remand with instructions to calculate and award benefits "when it is clear from the record that a claimant is entitled to benefits,

observing on occasion that inequitable conduct on the part of the Commissioner can strengthen, though not control, the case for such a remand." Id.

In Varney v. Secretary of Health and Human Services ("Varney II"), 859 F.2d 1396 (9th Cir. 1988), the Ninth Circuit adopted the "credit-as-true" rule: that is, "if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true." Id. at 1398. In Hammock v. Bowen, 879 F.2d 498 (9th Cir. 1989), the Ninth Circuit held that the credit-as-true rule applies to medical opinion evidence, not only claimant testimony. Id. at 503; see also Garrison, 759 F.3d at 1022 (applying credit-as-true rule where ALJ failed to provide legally sufficient reasons to reject Garrison's testimony and the opinions of her treating and examining medical caretakers). "[T]he purpose of the credit-as-true rule is to discourage ALJs from reaching a conclusion about a claimant's status first, and then attempting to justify it by ignoring any evidence in the record that suggests an opposite result." Vasquez v. Astrue, 572 F.3d 586, 594 (9th Cir. 2009). "By requiring the ALJ to specify any factors discrediting a claimant at the first opportunity, the rule ensures that pain testimony is carefully assessed, and helps prevent unnecessary duplication in the administrative process." Id. (internal citation omitted).

The rule does not apply in all cases, however. Varney II "was specifically limited to cases 'where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited.'" Vasquez, 572 F.3d at 593 (quoting Varney II, 859 F.2d at 1401). In Garrison, the Ninth Circuit laid out three criteria that, if met, warrant application of the credit-as-true doctrine:

(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to

29

provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

759 F.3d at 1020.  In evaluating the first issue, courts "consider whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1103-04 (9th Cir. 2014).

The Ninth Circuit has, "in a number of cases, stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when all of these conditions are met." Garrison, 759 F.3d at 1020.  Despite this, the Ninth Circuit has also stated that district courts have some "flexibility" in deciding whether to apply the rule. Id. at 1020-21 (discussing Connett v. Barnhart, 340 F.3d 871 (9th Cir. 2003)); see also Treichler, 775 F.3d at 1100 (noting that district courts have discretion in deciding whether to remand for further proceedings or an award of benefits, and that this decision "is a fact-bound determination that arises in an infinite variety of contexts").  District courts should "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." Garrison, 759 F.3d at 1021.

Moreover, "[T]here are other factors which may justify application of the credit-as-true rule, even where application of the rule would not result in the immediate payment of benefits." Vasquez, 572 F.3d at 593.  For example, where the claimant is "of advanced age and ha[s] already experience a severe delay in her application," the Ninth Circuit has applied the credit-as-true rule. Id. (applying credit-as-true rule where the plaintiff was 58 years old and had applied for benefits in October 2002, 6 years before the Ninth Circuit's decision); see also Hammock,

1    879 F.2d at 503.

2        **2.    Analysis.**

3        The Court finds that the three-part test articulated in <u>Garrison</u> has been met.

4    First, the record has been fully developed and further administrative proceedings

5    would serve no purpose.  <u>See</u> <u>Garrison</u>, 759 F.3d at 1021 ("[A] remand for the

6    purpose of allowing the ALJ to have a mulligan" is not "a remand for a 'useful

7    purpose' under the first part of credit-as-true analysis.").  Second, as discussed

8    <u>supra</u>, the ALJ has failed to provide legally sufficient reasons for rejecting the

9    medical opinion of Dr. Carlson, Plaintiff's treating physician, and for rejected

10   Plaintiff's testimony regarding her pain.  Third, if the improperly discredited

11   evidence (Dr. Carlson's opinion and Plaintiff's pain testimony) were credited as

12   true, the ALJ would be required to find the claimant disabled on remand.  The

13   vocational expert specifically testified that the RFC given by Dr. Carlson would

14   preclude work.  AR 50-51.  <u>See</u> <u>Brewes v. Comm'r of Social Sec. Admin.</u>, 682 F.3d

15   1157, 1164-65 (9th Cir. 2012) (remanding for award of benefits where the

16   vocational expert testified that a person with the plaintiff's characteristics was not

17   employable).  <u>Compare</u> <u>Rivera v. Colvin</u>, 2014 WL 6966328, at *6 (C.D. Cal. Dec.

18   8, 2014) ("Remand for further proceedings is warranted here because the vocational

19   expert did not testify that a person could not work with the limitations described by

20   Dr. Sobol and consequently the third <u>Garrison</u> condition has not been met.").

21       In her motion to alter judgment (Dkt. 21), the Commissioner argues that

22   remand for further proceedings, rather than for an award of benefits, is appropriate

23   for several reasons. The Court addresses these reasons below.

24           a.    The Court Has Examined the Record as a Whole.

25       The Commissioner argues that the Court erred because, after finding that the

26   ALJ's stated reasons for discrediting Dr. Carlson's opinion and Plaintiff's

27   testimony were inadequate, the Court failed to examine the record as a whole.

28   "When a court assesses whether to credit evidence," the Commissioner argues, "all

of the record evidence is at play, not just evidence that the ALJ discusses or evidence that most favor's the plaintiff's position." (Dkt. 21 at 7.) While there is some authority contradicting this proposition, see Garrison, 759 F.3d at 1022 n.31 ("Although we do so here, we do not mean to suggest that, in every credit-as-true case, courts must undertake an independent review of the entire record."), this Court *has* examined the record as a whole, not merely the evidence cited by the ALJ.

For example, the only reasons the ALJ expressly gave for assigning Dr. Carlson's opinion little weight were inconsistencies with Dr. Carlson's treatment notes, the objective studies, and Dr. Carlson's earlier opinion. AR 27. The Court nevertheless has considered whether other evidence in the record—particularly Dr. Halbridge's June 2013 report and the opinions of the non-examining physicians, which the Court finds to be the most relevant other evidence—provided substantial evidence for assigning Dr. Carlson's opinion little weight. As discussed above (at pages 19-23), the Court finds that they do not. The Court has also undertaken an exhaustive review of all of Dr. Carlson's treatment notes, not merely the notes (or portions thereof) cited in the ALJ's decision, as discussed above (at pages 16-18).

          b.      There are No Material Conflicts or Ambiguities in the Record that Warrant Remand for Further Proceedings.

The Commissioner argues that the record "presents 'outstanding issues that must be resolved before a determination of disability can be made.'" (Dkt. 21 at 8, citing Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004)). Generally, unless the ALJ is completely remiss in his or her duties, there will always be *some* evidence in the administrative record that supports the ALJ's decision. The presence of some evidence that supports the decision, and some evidence that does not support it, does not automatically create a material conflict that forbids remand for an award of benefits. The issue is whether further proceedings would "serve [a] useful purpose." Garrison, 759 F.3d at 1020.

This case does not include the kind of factual conflicts at issue in, for example, <u>Treichler</u>, on which the Commissioner heavily relies. There the Ninth Circuit found "crucial questions as to the extent of Treichler's impairment given inconsistencies between his testimony and the medical evidence in the record." 775 F.3d at 1105. These inconsistencies included: (1) medical records that "consistently report[ed] that the [urinary] incontinence issue occur[red] at night, while Treichler claim[ed] that he regularly ha[d] daytime problems"; and (2) medical records that showed no "evidence of complaints to his doctors or other medical professional regarding fecal incontinence," while he claimed to have fecal incontinence once or twice a month. <u>Id.</u> at 1104. This type of conflict, concerning the basic facts of Plaintiff's alleged conditions, is not present here. The ambiguities to which the Commissioner points illustrate this.

First, the Commissioner argues that because some of Dr. Carlson's treatment notes are consistent with his RFC opinion but some show more benign findings, the case must be remanded for the ALJ to re-consider the treatment notes. (<u>Id.</u> at 9-10.) "[A] remand for the purpose of allowing the ALJ to have a mulligan" is not "a remand for a 'useful purpose' under the first part of credit-as-true analysis." <u>Garrison</u>, 759 F.3d at 1021. As discussed above, the ALJ previously examined the treatment notes and cherry-picked language that appeared inconsistent with Dr. Carlson's opinion. After the Court examined the treatment notes as a whole, however, it determined that they were not inconsistent with Dr. Carlson's opinion. There is no factual ambiguity about the notes to be resolved on remand.

Second, the Commissioner points to the Court's discussion of the February 2011 MRI (see above at pages 10-13). The ALJ pronounced the MRI inconsistent with Dr. Carlson's opinion because it did not show spinal canal or foraminal stenosis, without discussing evidence indicating that the MRI was of poor quality or later objective tests showing stenosis. The Commissioner argues that this other evidence "represent[s] exactly the 'conflicts and ambiguities' that warrant further

administrative proceedings." (Dkt. 21 at 10.) Again, remanding for the ALJ to re-consider this evidence, which the ALJ already had an opportunity to review, would simply be allowing the ALJ to have a second bite at the apple. After examining all of the objective tests in the record, the Court has found that they do not provide a basis for discounting Dr. Carlson's opinion.

Third, the Commissioner argues that remand for further proceedings is appropriate to resolve conflicts between Dr. Carlson's opinion and the opinion of the worker's compensation doctor and the non-examining State agency physicians. (Dkt. 21 at 12-14.) However, as discussed above (at pages 19-23), it was legal error for the ALJ to give the opinions of Drs. Amon, Medina, and Halbridge more weight than the opinion of Plaintiff's treating physician, because there was not substantial evidence in the administrative record as a whole to support this.

In sum, the Court concludes that Plaintiff has satisfied all three conditions of the credit-as-true rule and that a careful review of the record as a whole discloses no reason to seriously doubt that she is, in fact, disabled. A remand for a calculation and award of benefits is therefore appropriate.

## V.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the Judgment entered on March 10, 2017 (Dkt. 20), which reverses the decision of the Commissioner denying benefits and remands for the Commissioner to calculate and award benefits, shall remain in effect.

IT IS FURTHER ORDERED that the Commissioner's Motion to Alter Judgment (Dkt. 21) is DENIED.

DATED: June 02, 2017

KAREN E. SCOTT
United States Magistrate Judge

34